IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AVERY DENNISON CORP., | ) |
| Plaintiff, | ) Case No. 10 C 2744 |
| vs. | ) |
| CONTINENTAL DATALABEL, INC., | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Avery Dennison Corp. has sued Continental Datalabel, Inc., claiming that Continental infringed a patent owned by Avery. Continental has asserted a five-count counterclaim against Avery. Avery has moved to dismiss counts 3, 4, and 5. For the reasons set forth below, the Court grants Avery's motion.

## Background

Avery[1] is a Delaware corporation with its principal place of business in Pasadena, California. Pl.'s Compl. ¶ 4. It produces and sells pressure-sensitive adhesive labels and other office products. *Id.* Avery is also the assignee of U.S. Patent No. 7,709,071 ("the '071 patent"), entitled "Label Sheet Design for Easy Removal of Labels." *Id.* ¶ 7. According to its abstract, the '071 patent describes "[a] label sheet having a release liner and a column of labels releasably attached thereto," such that "a

---

[1] As used in this opinion, the term "Avery" refers collectively to Avery Dennison Corporation, the inventors of the '071 patent, and Avery's attorneys.

user can tear off the liner . . . thus leaving a minor edge of a column of labels exposed for easy removal from the label sheet." Def.'s Mem., Ex. E at 1 (internal citations omitted).

The '071 patent was issued based on Application 10/504,600 ("the application"), originally filed with the United States Patent and Trademark Office ("PTO") on February 28, 2003. *Id.* During the prosecution of the Application, Avery submitted an information disclosure statement ("IDS") identifying certain prior art references, including U.S. Patent Nos. 3,038,597 and 3,588,829 ("Brady '597" and "Brady '829" respectively, but collectively the "Brady references"). Pl.'s Mem., Ex. 2. The patent examiner assigned to the application at the time was Nasser Ahmad. *Id.* at 1. He initialed these references on the IDS on June 21, 2007, indicating that he had considered them. *Id.* at 1-2.

In a final office action dated May 5, 2009, the PTO rejected certain claims in the application, relying on PCT International Publication No. WO 01/89825 ("the Do publication") and U.S. Patent Nos. 2,765,205 and 3,480,198 (the "Capella patent" and the "Repko patent" respectively). *See* Def.'s Mem., Ex. B at 18. On January 12, 2010, Avery filed an interview response and amendment ("the amendment") in reply to the final office action. *Id.* at 1-18. By this time, the PTO had reassigned the application to examiner Victor S. Chang. *See id.* at 1. The amendment canceled all previous claims in the application and presented thirty-four new claims. *Id.* at 8-17. The amendment contained a section ("the bullet points") distinguishing the new claims from the Do publication and the Capella and Repko patents. *Id.* at 2-4.

On May 4, 2010, the PTO issued the '071 patent. That same day, Avery filed the present action. Continental filed its answer and counterclaim on June 25, 2010.

## Discussion

In considering Avery's motion to dismiss under Rule 12(b)(6), the Court accepts the facts stated in the counterclaims as true and draw all reasonable inferences in favor of Continental. *Parish v. City of Elkhart*, 614 F.3d 677, 679 (7th Cir. 2010). Though a complaint need not contain "detailed factual allegations, . . . a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. A complaint fails to state a claim under Rule 8(a)(2) "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct[.]" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).

**1.    Inequitable conduct claim**

In count 3, Continental alleges that the '071 patent is unenforceable because Avery engaged in inequitable conduct before the PTO during the prosecution of the Application.

The Federal Circuit has held that "a patent may be rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or deceive the examiner, fails to disclose material information or submits materially false information to the PTO during prosecution." *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1345 (Fed. Cir. 2007) (internal citation and quotation marks omitted). "Information is 'material' when there is a substantial likelihood that a reasonable examiner would have considered the

3

information important in deciding whether to allow the application to issue as a patent."
*Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1179 (Fed. Cir. 1995).

In count 3, Continental alleges two bases for concluding that Avery engaged in inequitable conduct. The first involves allegedly misleading statements in the bullet points, while the second involves an omission relating to the allegedly inherent curling of adhesive labels.

### a. The bullet points

Continental argues that Avery committed inequitable conduct because it "intentionally omitted to tell Examiner Chang" in the bullet points that certain limitations Avery outlined "were already known from prior art that had been previously submitted by" Avery–-namely, the Brady references. Countercl. ¶ 29; *see also generally id.* ¶¶ 26-47.

Taking these allegations as true, count 3 fails to state a claim of unenforceability based on inequitable conduct. As Continental concedes in its counterclaim, Avery filed an IDS disclosing the Brady references to the PTO on April 17, 2007. *Id.* ¶ 19. It is well settled that "[a]n applicant cannot be guilty of inequitable conduct if the reference was cited to the examiner" in a previous filing. *Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318, 1327 (Fed. Cir. 2000); *see also Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1185 (Fed. Cir. 1995) ("When a reference was before the examiner, whether through the examiner's search or the applicant's disclosure, it cannot be deemed to have been withheld from the examiner") (internal quotation marks omitted). This is so "whether or not [the prior art reference] was a ground of rejection by the examiner." *Id.*

4

Further, as noted above, in the bullet points, Avery sought only to distinguish the Do publication and the Capella and Repko patents. *See* Def's. Mem., Ex. B at 2 ("However, *neither individually nor in combination* do the Do publication, the Capella patent, or the Repko patent, teach or suggest the following . . .") (emphasis in original). Avery had no obligation to offer its view on how the Brady references bore on their arguments regarding these other references, given that "an inventor's opinions regarding a prior art device known to the examiner are not within the domain of material that must be submitted to the PTO." *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1378 (Fed. Cir. 2001). Accordingly, Avery's failure to raise the Brady references again in the bullet points is not a material omission for purposes of inequitable conduct.

### b. "Inherent curling"

Continental also alleges in count 3 that "[a]dhesive-coated paper labels are known to exhibit curling during and after separation from a release liner." Countercl. ¶ 50. According to Continental, this property prevents the exposed edge of a partially-separated label from adhering to a flat surface on which the label sheet is placed unless pressure is applied. *Id.* ¶¶ 53-54. For this reason, the limitation offered by Avery in the fourth bullet point—"the label sheet assembly is configured to be placed on a flat surface after the separation of the portion of the release liner from the part of the first label without creating an adhesive bond between the first label and the flat surface"—is "inherent or obvious in view of prior art label assemblies." *Id.* ¶¶ 55, 60. Continental contends that because Avery "intentionally did not disclose the inherent curling of paper

labels" to the PTO, but instead "presented the fourth bullet point . . . as an important feature distinguishing" the application from prior art, it engaged in inequitable conduct. *Id.* ¶¶ 58-59.

These allegations also fall short of what the law defines as inequitable conduct. Assuming that curling is an inherent feature of paper labels, Avery's disclosure of prior art describing paper labels is sufficient to disclose inherent curling to the Examiner. As the Federal Circuit has noted, when a patent applicant discloses a prior art reference, "'the content of [the reference] is presumed to be before the examiner[.]'" *McKesson Info. Solutions, Inc. v. Bridge Med., Inc.*, 487 F.3d 897, 924 (Fed. Cir. 2007) (quoting *Li Second Family Ltd. P'ship v. Toshiba Corp.*, 231 F.3d 1373, 1378 (Fed. Cir. 2000)).

Though *McKesson* and *Li* did not discuss whether disclosure of a prior art reference necessarily constitutes disclosure of the invention's properties, other courts have concluded that the "content" of a prior art reference includes properties or features inherent in the reference. *See, e.g., Jeneric/Pentron, Inc. v. Dillon Co.,* 171 F. Supp. 2d 49, 79-80 (D. Conn. 2001) ("Plaintiff disclosed the '366 Patent to the Examiner as prior art; it is only calculations inherent in Example 2 of the '366 Patent that went 'undisclosed.' . . . The calculations embodied in the '366 Patent, therefore, were presumed to be before the Examiner"); *Standard Mfg. Co. v. United States*, 25 Cl. Ct. 1, 73 (1991) ("To the extent . . . that the Scott Russell mechanism is inherent in the [prior art reference], the mechanism, in fact, was before the Examiner").

The Court finds these decisions persuasive, particularly given that the Federal Circuit "deem[s a patent examiner] to have experience in the field of the invention." *In*

*re Sang-Su Lee*, 277 F.3d 1338, 1345 (Fed. Cir. 2002). Accordingly, the Court concludes that disclosure to the Examiner of a prior art reference describing paper labels is sufficient to disclose an allegedly inherent property of paper labels—namely, curling.

In this case, Continental's inequitable conduct claim is premised on the allegation that the prior art Avery cited contains references describing paper labels. Countercl. ¶ 60 ("The inherent curling of paper labels renders the fourth bullet point inherent or obvious *in view of prior art label assemblies* . . . .") (emphasis added). Such references were, in fact, made of record during the prosecution of the '071 patent. *See, e.g.,* U.S. Pat. No. 3,914,483, col. 1, l. 51-54 (filed Feb. 8, 1974) (Patent for "[d]ouble die-cut label," stating that "[e]ach label includes an indicia carrying sheet *generally formed of paper* and having a layer of a *pressure sensitive adhesive* formed on the rear surface thereof.") (emphasis added). Avery's citation of this prior art brought the issue of inherent curling to the Examiner's attention. Accordingly, because the Court deems Avery to have disclosed the allegedly inherent curling property when it disclosed prior art references describing paper labels, Continental has failed to state a claim of inequitable conduct.

**2.**     ***Walker Process* fraud claim**

In count 4, Continental alleges that, by attempting to enforce the '071 patent despite having obtained it fraudulently, Avery committed "*Walker Process* fraud" in violation of section 2 of the Sherman Act. In asserting this claim, Continental relies on the same factual basis as that articulated in count 3. *See* Countercl. ¶ 72. In arguing

7

that Avery acted with intent, Continental pleads additional facts suggesting that the "curling of paper label material" is well known to Avery. *Id.* ¶ 73(e).

Proof that a patentee "obtained the patent by knowingly and willfully misrepresenting facts to the Patent office" is "sufficient to strip [the patentee] of its exemption from the antitrust laws," provided that "the other elements necessary to a [section] 2 case are present as well." *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965); *see also id.* at 174. However, "[a] finding of inequitable conduct does not by itself suffice to support a finding of Walker Process fraud, because 'inequitable conduct is a broader, more inclusive concept than the common law fraud needed to support a Walker Process counterclaim.'" *Dippin' Dots*, 476 F.3d at 1347 (quoting *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1069 (Fed. Cir. 1998)). Accordingly, a party that fails to prove inequitable conduct cannot establish a *Walker Process* violation that is premised on such conduct. *See FMC Corp. v. Manitowoc Co., Inc.*, 835 F.2d 1411, 1417 (Fed. Cir. 1987) ("FMC's failure to establish inequitable conduct precludes a determination that it had borne its greater burden of establishing the fraud required to support its *Walker Process* claim.").

As discussed above, the Court concludes that Continental has failed to state a claim of inequitable conduct. Accordingly, Continental also fails to state a claim for *Walker Process* fraud, which requires "higher threshold showings of both materiality and intent[.]" *Dippin' Dots*, 476 F.3d at 1346. In particular, Continental has failed to allege a material misrepresentation on the part of Avery. As a result, Continental cannot show "that the patent would not have issued but for the patent examiner's

justifiable reliance on the patentee's misrepresentation or omission." *Id.* at 1347. For this reason, the Court need not reach the question of whether Continental adequately alleged the remaining elements of antitrust liability.

### 3. Sham litigation claim

Finally, Continental alleges in count 5 that Avery engaged in "sham litigation" in violation of section 2 of the Sherman Act by attempting to enforce the '071 patent in bad faith with intent to monopolize. This claim is based on two factual premises. First, Continental essentially repeats the facts it alleged in count 3: "by not calling Examiner Chang's attention to Brady '829 and '597, Avery facilitated the issuance of the '071 patent" and thereafter "filed this lawsuit, in bad faith, with full knowledge that the asserted patent claims are invalid." Countercl. ¶ 90. Second, Continental argues that Avery acted in bad faith because it failed to conduct a test "measuring adhesion of [Continental's] pressure-sensitive adhesive labels" that would have shown Continental did not infringe the '071 patent. *Id.* ¶¶ 97-99.

To sustain a claim of engaging in sham litigation, a party must satisfy the two-part test outlined in *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993):

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under [*E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961)], and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor

> through the use of the governmental *process*–as opposed to the *outcome*
> of that process–as an anti-competitive weapon.

*Id.* at 60-61 (internal quotation marks and citation omitted) (emphasis in original). In assessing a sham litigation claim, a court "must remember that even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit." *Id.* at 61 n.5 (internal quotation marks omitted).

The allegations in count 5 do not state a claim for sham litigation because, taken as true, they do not suggest that Avery's lawsuit was objectively baseless. First, Continental's argument based on the Brady references is speculative at best. Though Continental contends that Avery knew the '071 patent was invalid based on the Brady references, neither examiner Ahmad nor examiner Chang made such a finding. To the contrary, examiner Ahmad indicated that he considered the Brady references, and examiner Chang had the references before him when he approved the '071 patent. A reasonable litigant in Avery's position, having made the disclosures Avery made, could expect success in a lawsuit against Continental once the '071 patent was issued by the PTO. Accordingly, the Court cannot conclude that Avery's lawsuit is objectively baseless.

Continental's second allegation—that Avery failed to test Continental's products—is also insufficient to state a sham litigation claim. As the Federal Circuit has stressed, "sham litigation requires more than a failed legal theory," and "[n]either the bringing of an unsuccessful suit to enforce patent rights, nor the effort to enforce a patent that falls to invalidity, subjects the suitor to antitrust liability." *C.R. Bard, Inc. v. M3 Sys., Inc.,* 157 F.3d 1340, 1369 (Fed. Cir. 1998). Despite this, Continental

argues—without citation to authority—that Avery's failure to test its products for non-infringement is a sufficient factual basis for a sham litigation claim. Though Continental may be able to demonstrate that its labels do not, in fact, infringe the '071 patent, Avery's failure to perform a particular test identified by Continental does "not permit the court to infer more than the mere possibility" that Avery brought suit against Continental in bad faith. *Iqbal*, 129 S. Ct. at 1950.

## Conclusion

For the reasons stated above, the Court grants plaintiff's motion to dismiss counts 3, 4, and 5 of defendant's counterclaim [docket no. 29].

_____
MATTHEW F. KENNELLY
United States District Judge

Date: November 30, 2010